# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**ERIN MCDANIEL,**

    **Plaintiff,**

v.

**PNC BANK,**

    **Defendant.**

**Case No. 2:11-CV-00683**
**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Mark R. Abel**

## OPINION AND ORDER

Plaintiff, Erin McDaniel ("McDaniel"), brings this action against Defendant, PNC Bank, National Association ("PNC Bank"), alleging claims for employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Ohio's anti-discrimination statute, Ohio Revised Code, § 4112.01 *et seq.*[1] This matter is before the Court for consideration of Defendant's Motion for Summary Judgment. (ECF No. 20.) For the following reasons, Defendant's Motion is **GRANTED**.

## I. BACKGROUND

McDaniel began working for PNC Bank (formerly National City Bank) in 1998. (McDaniel Dep. 80–82, ECF No. 22-1.) McDaniel initially worked as a Customer Sales and Service Representative, but she eventually began working in sales and as an online banking representative. (*Id.* at 81–83.) In October 2008, McDaniel voluntarily transferred to a new position as a direct banking sales agent. (*Id.* at 94–96.) In this position, McDaniel's basic duty

---

[1] Within her Complaint, Plaintiff also brought a claim for intentional infliction of emotional distress under Ohio law. (Compl. ¶¶ 32–37, ECF No. 3.) Upon Defendant's Motion, the Court dismissed this claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Opinion & Order, ECF No. 18.)

was to sell banking products to customers through an online "chat" forum. (*Id.* at 99–100.) McDaniel's daily shift began at 7:00 a.m. (*Id.* at 96.) Beginning in October 2008, Amy Lyon ("Lyon") was McDaniel's supervisor. (*Id.* at 97–98.)

## A.  Seating Assignments

Lyon states that she typically supervised a team of around fourteen employees. (Lyon Dep. 18–19, ECF No. 22-3.) Lyon's team members worked in an area of cubicles, with Lyon's cubicle located at the edge of the team's area. (*Id.* at 21.) Team members sat in "pods" consisting of two to four people per workstation area. (*Id.* at 21–22, 82.) Each team member was assigned a specific seat. (*Id.* at 22.) According to Lyon, Steve Jones ("Jones")—Lyon's manager—created the team's seating chart with her input. (*Id.*)

McDaniel, who is African American, sat in a workstation pod with two other African American employees, Alonzo Jefferson ("Jefferson") and Adam Lee ("Lee"), for the majority of her time on Lyon's team. (*See* Lyon Dep. 26–27; McDaniel Dep. 292–93.) The workstation pod for these employees was directly behind Lyon's cubicle. (Lyon Dep. 27; McDaniel Dep. 292.) Rodney Revish ("Revish"), the only other African American on Lyon's team during the relevant period, sat near McDaniel, but in a different pod. (McDaniel Dep. 292–93.)

McDaniel avers that shortly after she received this seating assignment,[2] she questioned Lyon about the placement of Jefferson, Lee, and herself. (*Id.* at 295.) According to McDaniel, Lyon stated, in a joking manner, words to the effect that "like, I've got to keep my eye on you guys." (*Id.*) McDaniel further states that shortly after the seating assignment she complained to

---

[2] At her deposition, McDaniel could not recall the precise period when she began sitting with Jefferson and Lee. (McDaniel Dep. 291.) She indicated that the move occurred "a couple of months" after she began the position in October 2008. (*See id.* at 291–92.)

2

Lyon, directly questioning her why three African-Americans were being seated together. (*Id.* at 346.) McDaniel avers that, at this time, Lyon replied that the seating assignments were due to scheduling. (*Id.*) In addition to informally complaining about the seating arrangement to Lyon, McDaniel lodged an official complaint with human resources in June 2010. (*Id.* at 290–92.) At various points in her deposition, McDaniel indicates that Lyon was generally less attentive to, and more dismissive of, Jefferson, Lee, and herself in comparison to other employees. (*See, e.g.*, *id.* at 28, 241–43.)

Lyon testified that employees were seated based on the shifts that they worked. (Lyon Dep. 23.) Other team members, specifically Jefferson and Brook Kidd ("Kidd"), also stated that it was their understanding that the seating chart was based on scheduling. (Jefferson Dep. 24, ECF No. 21-5; Kidd Dep 20, ECF No. 22-2.) Lyon asserts that both Jefferson and Lee worked morning shifts. (Lyon Dep. 26–27.) Specifically, Lyon states that Jefferson's shift began at 7:00 and Lee's shift began at 9:00. (*Id.* at 26.) According to Lyon, Revish was assigned to a different work station than McDaniel because he worked a different shift. (*Id.* at 82–83.) Moreover, Lyon testified that all of her employees were in the same general vicinity. (*Id.* at 82.)

McDaniel, however, maintains that team members were not seated based on their work schedules. (*See* McDaniel Dep. 108–09.) McDaniel states that in addition to her shift, which began at 7:00, there were three other shifts beginning at 8:00, 10:30, and 11:30. (*Id.* at 103.) According to McDaniel, although Jefferson worked an earlier shift with her, Lee's shift did not begin until 10:30. (*Id.* at 108.) McDaniel emphasizes, based on the testimony of Lyon and Kidd, that a Caucasian employee, Adrienne Boswell, also worked a morning shift, but sat at a single workstation. (Lyon Dep. 26–27, Kidd Dep. 19–20.) Moreover, Kidd's testimony reflects that

3

although she began work at 10:30, she sat by Terry Shelby, who began at 8:30, and Revish, who began at 11:30. (Kidd Dep. 12, 17, 21.)

## B. Attendance and Discipline

Defendant maintains that McDaniel had attendance issues throughout her employment with PNC Bank dating back to 1999. (*See, e.g.*, McDaniel Dep. 127–29.) On June 9, 2009, McDaniel received written coaching from Lyon regarding her attendance. (McDaniel Dep. Ex. 18, ECF No. 21-2.) The coaching form specifically listed six absences and six tardies between January 2009 and May 2009. (*Id.*) During her deposition, McDaniel did not deny the absences, but disagreed with the tardies. (McDaniel Dep. 139.) McDaniel received written attendance counseling in November 2009. (McDaniel Dep. Ex. 19, ECF No. 21-2.) The November 2009 form listed five additional tardies occurring between June 2009 and October 2009. (*Id.*) McDaniel disagrees with these tardies. (McDaniel Dep. 151.)

The record does not reflect that McDaniel received any further counseling or discipline regarding her attendance. (*See id.* at 297.) Lyon, however, referenced McDaniel's attendance issues in her 2009 annual performance review. (McDaniel Dep. Ex. 15, ECF No. 21-2.) Although mentioning attendance, the review also reflected that McDaniel had "since made improvements in this area." (*Id.*) Overall, Lyon assigned McDaniel an "Achieve" score on her 2009 performance review, the same score she received in 2007 and 2008. (McDaniel Dep. 120–21.)

McDaniel maintains that another employee, Kidd, received more favorable treatment with regard to attendance despite more egregious conduct. (*See id.* at 144, 298.) The record reflects that Kidd received verbal coaching, which was memorialized in writing, on April 16, 2009.

4

(Kidd Dep. 27–29; Kidd Dep. Ex. 2, ECF No. 21-4.) The coaching occurred because Kidd had accumulated seven absences within a rolling calendar year, with the seventh absence coming on April 13, 2009. (*Id.*) Kidd received a second verbal warning, with accompanying written documentation, on June 11, 2009 because she had been absent on June 10, 2009. (Kidd Dep. 30; Kidd Dep. Ex. 2.) Finally, Kidd received a written warning in June 22, 2010 for attendance related concerns, although this warning was later rescinded. (Kidd Dep. 31.) According to Kidd, the written warning was rescinded because supervisors were not suppose to calculate absences and tardies together. (*Id.* at 32.) Within her deposition testimony, McDaniel implies that Kidd was treated more favorably because Kidd did not receive a written warning—presumably the June 2010 written warning—until after McDaniel complained to human resources about unfair treatment. (*See* McDaniel Dep. 144, 299, 301.) At the time of her deposition, however, McDaniel was not aware that Kidd had received coaching regarding her attendance twice in 2009. (*Id.* at 303.)

## C.    Working Conditions and Performance

As stated above, McDaniel's position as an online sales agent was to sell customers banking products during online "chats." (McDaniel Dep. 99–100.) McDaniel, and other sales agents, were required to follow various policies and procedures during their chats. (*See id.* at 163–65; McDaniel Dep. Ex. 21, ECF No. 21-2.) Chats were monitored, at random times, by both Plaintiff's supervisors as well as Quality Monitoring, a separate department within PNC Bank. (Lyon Dep. 54–55; *see also* McDaniel Dep. 157–59.) Lyon states that she and sales coach Tashawna Jefferson would engage in regular transcript review sessions in which they would pull a random chat and give feedback. (Lyon Dep. 58–59.) Quality Monitoring would also review

5

chats at random. (McDaniel Dep. 158–59.) Records from 2009 reflect that there were at least seven times when reviewers from Quality Monitoring concluded that McDaniel had failed to follow compliance regulations. (*Id.* at 191; McDaniel Dep. Ex. 22, ECF No. 21-2.)

McDaniel states that, in early 2010, Lyon reduced the number of chats McDaniel could conduct at a single time from three to two. (McDaniel Dep. 313, 316–18.) Upon discovering that she was only capable of two chats, in March 2010, McDaniel sent an email to Lyon and Jones requesting that she be "bumped up" to three chats. (McDaniel Dep. Ex. 33.) Within approximately ten minutes of sending the email, McDaniel was bumped to three chats. (McDaniel Dep. 321.) Lyon admits that any team leader in online sales was capable of controlling the number of chats an employee could conduct at one time. (Lyon Dep. 65.) Lyon states, however, that in early 2010, during the conversion from National City to PNC Bank, consultants started with fewer than three chats. (Lyon Dep. 66.) During her deposition, Kidd confirmed that her number of chats was lowered during busy periods. (Kidd Dep. 40.) McDaniel maintains that the chat limit negatively impacted her because it resulted in missed sales opportunities. (McDaniel Dep. 322.) According to both Lyon and Kidd, however, during the relevant time period, employees were on a fixed incentive plan and the amount of chats an employee conducted in a given period did not impact their incentives. (Lyon Dep. 65; Kidd Dep. 41.)

McDaniel maintains that Lyon was generally dismissive toward her and often singled her out. (McDaniel Dep. 241–42.) Of particular note, McDaniel avers that her stress was the worst in April 2010 following an incident involving Lyon. (*Id.* at 398.) On this occasion, Lyon had purchased a Subway sandwich platter for her sales team. (Lyon Dep. 75.) According to

6

McDaniel, a number of her co-workers had made joking remarks about the Subway. (McDaniel Dep. 242.) McDaniel states that when she made the same type of remark, Lyon "snapped" and told her that she did not have to have any of the food. (*Id.* at 242, 333-34.) Lyon and Kidd both state that, during this incident, McDaniel told Lyon (in some variation) that she could "take [the sandwiches] and shove them." (Lyon Dep. 75; McDaniel Dep. 36.)

On May 20, 2010, due to a review of two earlier chats, Lyons and Tashawna Jefferson told McDaniel that she had to properly quote the Annual Percentage Rate/Annual Percentage Yield ("APR/APY") during her chats. (McDaniel Dep. 201–02; McDaniel dep. Exs. 23–24, ECF No. 21-2.) On May 24, 2010, after receiving an email from Ms. Jefferson regarding an earlier chat transcript, Lyon again discussed quoting the APY with McDaniel. (McDaniel Dep. 205; McDaniel Dep. Ex. 25, ECF No. 21-2.) Following this discussion, an employee put a comment in Jones' suggestion box requesting clarification about properly quoting APY. (McDaniel Dep. 324–36.) McDaniel avers that Alonzo Jefferson wrote the comment. (*Id.*) According to McDaniel, Jones, with Lyons present, asked her if she had written the comment (*Id.* at 326–28.) On May 27, 2010, Lyon, in a meeting with Jones, gave McDaniel a written warning regarding her performance. (*Id.* at 219; McDaniel Dep. Ex. 26, ECF No. 21-2.) The warning indicates that McDaniel received a failing score on a May 23, 2010 chat because she did not properly disclose the APR. (McDaniel Dep. 219–20; McDaniel Dep. Ex. 26.) The written warning reflects Adam Ferrari, from Quality Monitoring, reviewed the chat transcript and emailed Lyon to inform her that McDaniel had received a failing score. (*See* McDaniel Dep. Ex. 26.) McDaniel, however, maintains that she never received a copy of any formal chat evaluation relating to May 23, 2010. (McDaniel Dep. 238.)

7

## D. Complaints and Resignation

The record reflects that during her employment with PNC Bank, McDaniel made various complaints regarding Lyon. As detailed above, following the early 2009 change in office seating, McDaniel states that she complained to Lyon about seating the African-American employees in a group. (McDaniel Dep. at 345–46.) In April 2010, following the Subway incident, McDaniel met with Jones. (*Id.* at 333.) According to McDaniel, she informed Jones about the Subway incident as well as other issues she was having with Lyons. (*Id.* at 335–36.) At this point, however, McDaniel did not indicate that she felt race was playing a role in Lyon's behavior. (*Id.* at 336–37, 340.) Around the same time period, from March to May 2010, McDaniel reports that she was speaking with human resources about Lyons general treatment of her. (*Id.* at 340–44.) McDaniel, once again, did not mention race to human resources during this period. (*Id.* at 344–45.)

In June 2010—following the May 27, 2010 written warning—McDaniel complained to human resources, and specifically David Snow, stating that Lyons was discriminating against her because of her race and engaging in retaliatory conduct. (*See* McDaniel Dep. 330–32.) On July 9, 2010, McDaniel filed charges of racial and gender discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission. (McDaniel Dep. Ex. 4, ECF No. 21-2.)

On September 15, 2010, McDaniel took a leave of absence from work. (McDaniel Dep. 243–47.) According to McDaniel, she left because of her anxiety and stress. (*Id.* at 243.) At the time, McDaniel wrote a note to Lyon stating that she had applied for leave under the Family Medical Leave Act ("FMLA"). (*Id.* at 247.) At her deposition, McDaniel stated that she did not

8

remember any specific event or incident occurring during the days or weeks prior that led to her leave of absence. (*Id.* at 249.) While on leave, McDaniel looked for educational opportunities and applied to the Aveda Institute. (*Id.* at 270;Terrell Decl. Ex. 1, ECF No. 21-6.)

On October 15, 2010, McDaniel submitted her letter of resignation effective October 31, 2010. (McDaniel Dep. 274; McDaniel Dep. Ex. 31, ECF No. 21-2.) At her deposition, McDaniel admitted that she wrote the letter voluntarily. (McDaniel Dep. 274.) McDaniel began attending the Aveda Institute on November 1, 2010. (*Id.* at 57–58.) McDaniel filed this action in July 2011.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59

9

(1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; s*ee also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. ANALYSIS

#### A. Discrimination

##### 1. Applicable Law

Within her Complaint, McDaniel first brings claims for racial discrimination based on disparate treatment.[3] To establish a *prima facie* case of discrimination, based on circumstantial evidence,[4] a plaintiff must establish that "(1) [plaintiff] is a member of a protected class; (2) [plaintiff] was qualified for [the] job; (3) [plaintiff] suffered an adverse employment decision; and (4) [plaintiff] was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Serrano v. Cintas Corp.*, 699 F.3d 884, 892–93

---

[3] McDaniel brings her claims for race discrimination under Ohio's anti-discrimination statute. Nevertheless, "[a] claim for race discrimination under Ohio Revised Code § 4112.02(A) is evaluated using the same analytical framework as a Title VII claim." *Arnold v. City of Columbus*, No. 2:08–cv–0031, 2011 WL 1303593, at *6 (S.D. Ohio Mar. 31, 2011); *see also Canady v. Rekau & Rekau, Inc.*, No. 09AP-32, 2009 WL 3021764, at *4 (Ohio Ct. App. Sept. 22, 2009) ("Generally, Ohio courts look to federal case law interpreting Title VII to decide claims alleging a violation of [Revised Code § 4112.02.]"). Within their briefing, both parties predominantly cite to federal case law. Accordingly, the Court will apply the framework of Title VII for the purposes of its analysis.

[4] McDaniel does not submit direct evidence of discrimination.

10

(6th Cir. 2012) (internal quotations omitted, alterations in original). If a plaintiff meets the *prima facie* requirements, the burden then shifts to the defendant to offer a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 893 (internal quotations omitted). Once a defendant offers such a reason, the burden returns to plaintiff to demonstrate that the defendant's proffered reason is a pretext for discrimination. *Id.*

A plaintiff may also establish race discrimination through a mixed-motive claim.[5] *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). To survive summary judgment on such a claim a plaintiff must establish that "(1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)).

Regardless of whether a plaintiff pursues a mixed-motive or single-motive discrimination claim, she "must demonstrate that [she] has suffered an adverse employment action." *Id.* at 402 (internal quotations omitted). The United States Court of Appeals for the Sixth Circuit has provided the following guidance in assessing adverse employment action:

> An adverse employment action has been defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir.2004) (en banc) (citation omitted). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *Id.* at 797. Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141

---

[5] PNC Bank maintains that McDaniel is not entitled to a mixed-motive analysis. Because the Court finds that summary judgment is proper under either approach, it need not resolve this issue.

11

L.Ed.2d 633 (1998)).

*Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). Moreover, "[t]he Sixth Circuit has consistently held that *de minimus* employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000).

Sixth Circuit case law suggests that negative action in the form of written warnings, poor performance evaluations, and performance improvement plans are not, in and of themselves, materially adverse employment actions. *See, e.g., Novotny v. Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008) (holding that placing an employee on a plan to improve her work performance and forcing that employee to turn in self-evaluations early did not constitute materially adverse action); *Thomas v. Potter*, 93 F. App'x 686, 688 (6th Cir. 2004) (concluding that a letter of warning, as opposed to a notice of removal, did not satisfy the adverse action element); *Douglas v. Caldera*, 29 F. App'x 257, 258–59 (6th Cir. 2002) (indicating that verbal and written counseling, without other consequences such as lost wages or benefits, were insufficient to qualify as a material change); *see also Lockett v. Zatko*, No. 3:10 CV 1024, 2011 WL 5588730, at *7 (N.D. Ohio Nov. 16, 2011) ("But in the Sixth Circuit, a written warning is not an adverse employment action when it does not significantly change a plaintiff's employment status."). On the other hand, the Sixth Circuit has indicated that such actions may constitute adverse employment action when they comes with tangible employment consequences that the employee "suffer[s], or is in jeopardy of suffering . . . ." *Goldfaden v. Wyeth Labs., Inc.*, 482 F. App'x 44, 48–49 (6th Cir. 2012).

Relatedly, an employee may establish an adverse employment action by establishing that she was constructively discharged. *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481

12

(6th Cir. 2012). "To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit." *Id.* Moreover, the Sixth Circuit has explained:

> Whether a reasonable person would have [felt] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Id.* at 482 (quoting *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005)).

### 2. Application

In this case, McDaniel has failed to demonstrate that she suffered a materially adverse employment action. First, the Court finds that McDaniel's contentions regarding the seating arrangement are insufficient to rise to the level of adverse employment action. A segregated work environment is of course a serious accusation.[6] Nevertheless, Plaintiff has failed to produce sufficient evidence for a reasonable jury to conclude that the seating arrangement significantly changed her employment status. Rather, the evidence reflects that there was no isolation of employees and that all of Lyon's team members sat in the same general vicinity. (*See* McDaniel

---

[6] Faced with similar circumstances, the Sixth Circuit noted that "race-based harassment that 'intimidat[es]' or 'offen[ds]' without causing economic harm may be actionable under Title VII's hostile-work-environment theory of liability . . . ." *Steward v. New Chrysler*, 415 F. App'x 632, 641 n.7 (6th Cir. 2011) (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). McDaniel, however, bases her action on disparate treatment and does not attempt to raise a hostile work environment claim.

13

Dep. 292; Lyon Dep. 82.) Accordingly, without further evidence, Plaintiff cannot satisfy the adverse action element based on her seating assignment. *Cf. Steward v. New Chrysler*, 415 F. App'x 632, 640-41 (6th Cir. 2011) (holding that conclusory allegations of a "segregated assembly line" did not qualify as an adverse employment action).

Second, under the circumstances of the case, McDaniel's attendance and performance related discipline fail to satisfy the adverse action requirement. As detailed above, McDaniel received attendance related coaching and counseling in 2009 and her 2009 performance review contained a remark about her attendance. In May 2010, McDaniel received a written warning concerning her performance in an online chat. Even taking these occurrences in combination, they do not rise to the level of an adverse employment action. McDaniel has not provided evidence—and the disciplinary forms on their face do not reflect—that these corrective actions came with the type of tangible employment consequences comparable to classic adverse actions. For example, McDaniel did not lose benefits, salary, or the opportunity for advancement as a result of these occurrences. The mere fact that such actions might have paved the way for more severe discipline in the future, based on future conduct, is not enough. *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (noting that although a performance improvement plan mentioned the possibility of termination "that possibility was contingent on future developments, rather than being a present plan or decision"). Moreover, despite criticism regarding her attendance, McDaniel still received an "Achieve" score on her 2009 performance review. *Cf. Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789–90 (6th Cir. 2000) (holding that receiving a "very good" performance evaluation as opposed to an "excellent" evaluation was not a tangible employment action).

14

Third, McDaniel's temporary reduction from three to two online chats does not constitute adverse employment action. The current evidence reflects that McDaniel's reduction did not have a material impact on her compensation or job responsibilities. During her deposition, McDaniel testified that the reduction in chats limited her sale opportunities. Nevertheless, both Lyon and Kidd state that, during the relevant period, team members were on a fixed incentive plan and that a reduction in chats did not influence incentives. (Lyon Dep. 65; Kidd Dep. 41.) McDaniel has not highlighted any evidence to counter this information. Moreover, the Court cannot overlook the temporary nature of the chat reduction. *See Bowman*, 220 F.3d at 462 (reasoning that the temporary nature of an employment action may make it non-material). Here, within minutes of McDaniel's request, her chat capability was increased to three. (McDaniel Dep. 321.)

Finally, McDaniel fails to produce sufficient evidence for a trier of fact to conclude that she was constructively discharged. McDaniel's subjective fears of future discrimination are not enough to meet the constructive discharge standard. In this case, a reasonable person in McDaniel's position would not have concluded that termination was inevitable or that she was being forced from her position. McDaniel was not demoted and did not lose significant job responsibilities. Furthermore, McDaniel concedes that there was no recent event that served as a catalyst for her resignation. (McDaniel Dep. 249.) Instead, McDaniel states that her most stressful encounter with Lyon, the Subway incident, occurred months before her leave of absence. (*Id.* at 398.) Finally, from the record evidence, it appears that McDaniel used her leave of absence to look for educational opportunities. Under these circumstances, McDaniel resignation—at least for the purposes of constructive discharge—was premature.

Because McDaniel fails to demonstrate an adverse employment action, she cannot establish a *prima facie* case of racial discrimination under Ohio law. Accordingly, PNC Bank is entitled to summary judgment on this claim.

**B.   Retaliation**

   **1.   Applicable Law**

McDaniel also submits claims for retaliation in violation of both Title VII and Ohio law.[7] Title VII as well as Ohio law, "prohibit[] an employer from retaliating against an employee who has opposed an 'unlawful employment practice.'" *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (quoting 42 U.S.C. § 2000e-3(a)). To establish a *prima facie* case of retaliation, McDaniel must show (1) that she engaged in protected activity; (2) that her employer knew of the protected activity; (3) that the employer took adverse employment action against her; and (4) that there was a causal connection between her protected activity and the adverse action. *Id.* at 468–69. Within the context of retaliation, an adverse employment action consists of an action that might have "[']dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rodriguez-Monguio v. Ohio State Univ.*, No. 11–3185, 2012 WL 3871888, at *8 (6th Cir. Sept. 7, 2012) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)).

An employee may engage in protected activity by either participating in an EEOC proceeding or "oppos[ing] an apparent Title VII violation." *Wasek*, 682 F.3d at 469. As the Sixth Circuit has explained, "an employee need not file a formal EEOC complaint to engage in

---

[7] "Plaintiff's Ohio state law retaliation claims are analyzed in the same manner as her Title VII claims." *Adkison v. Procter & Gamble Co.*, No. 1:10–cv–85, 2011 WL 6371084, at *14 n.16 (S.D. Ohio Dec. 19, 2011).

16

protected activity-rather it is the assertion of statutory rights that triggers protection . . . ." *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007) (internal quotations omitted). The Sixth Circuit "has interpreted protected activity broadly to include complain[ts] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). At the same time, however, the complaint must actually concern unlawful discrimination and vague charges will not suffice. *See, e.g., Collins v. Memphis Goodwill Indust., Inc.*, No. 11–5635, 2012 WL 3024003, at *7 (6th Cir. July 24, 2012) (email complaint to supervisor was not protected activity because it "did not reference any alleged act of sex discrimination or sexual harrassment"); *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (holding that although the plaintiff made a number of complaints to management regarding work-related issues, the plaintiff failed to establish protected activity because there was no indication of any objection to discriminatory conduct); *Fox*, 510 F.3d at 592 (employee's "vague charge" that management was "out to get him" did not constitute protected activity).

Finally, "[t]o establish causation, [a plaintiff] must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009). Moreover, "[c]ausation can be inferred from indirect or circumstantial evidence, including 'evidence that [the] defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). The Sixth Circuit has acknowledged that "[w]here an adverse employment action occurs very close in time after an

17

employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Nevertheless, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

### 2. Application

In this case, Plaintiff fails to establish a *prima facie* case of retaliation under Title VII or Ohio law. As detailed above, the record reflects that McDaniel complained about Lyon on various occasions. The evidence indicates that the majority of these complaints, however, were not protected activity.[8] In particular, McDaniel states that she complained to Jones and human resources on multiple occasions between March 2010 to May 2010. McDaniel concedes, however, that she did not suggest—on these occasions—that race was playing a role in Lyon's actions. (McDaniel Dep. 336–37, 340, 344–45, 348.) Rather, McDaniel's testimony reflects that she was only making general accusations of unfair treatment. (*See id.* at 344.) Likewise, the May 2010 comment in the suggestion box was not protective activity, because it did not have anything to do with discrimination. Accordingly, from the evidence, a reasonable fact finder could not conclude that McDaniel was opposing unlawful employment activity at these times.

Plaintiff, however, arguably engaged in protective activity when complaining to Lyon

---

[8] McDaniel's June 2010 complaint to human resources of racial discrimination and her filing of EEOC charges in July 2010 were clearly protected activity. Nevertheless, all of the alleged adverse employment actions that McDaniel challenges occurred prior to June 2010. Accordingly, McDaniel has not set forth a triable retaliation claim based on this protected activity.

18

about the seating arrangement. Specifically, shortly after she received her seating assignment next to Jefferson and Lee, McDaniels states that she complained to Lyon and questioned why African American employees were being seated together. (*Id.* at 345–46.) Although McDaniel was unable to remember the precise time of the seating arrangement, the record indicates that seats were assigned in late 2008 or early 2009. (*See id.* at 291–92.)

Assuming that McDaniel's complaint on this occasion was protected activity, she still fails to adequately establish causation. There is not a strong temporal relationship between McDaniel's questioning of the seating assignments and the allegedly adverse actions. Although McDaniel complained regarding the seating arrangement in late 2008 or early 2009, it was months later—in June 2009—when McDaniel first received coaching regarding her attendance. Outside of attendance discipline, the other actions that McDaniel opposes occurred in 2010. Additionally, with regard to her attendance, McDaniel does not dispute that she was absent on six occasions between January 2009 and May 2009, leading to her first discipline. Furthermore, the evidence reflects that Kidd, a similarly situated white employee, also received similar attendance related discipline on multiple occasions in 2009. Finally, with regard to the May 2010 performance discipline, McDaniel has not produced any evidence that a similarly situated employee, who engaged in similar or the same activity, was treated differently. Under these circumstances, a reasonable jury could not conclude that the alleged adverse actions were casually related to McDaniel's complaint regarding the seating arrangement.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. (ECF No. 20.) The Clerk is **DIRECTED** to remove this action from the Court's pending case

19

list.

**IT IS SO ORDERED.**

\_\_\_1-2-2012_____  
**DATE**

_____  
**EDMUND A. SARGUS, JR.**  
**UNITED STATES DISTRICT JUDGE**

20